oral argument not to exceed 15 minutes per side. Brent Lowry Caldwell, for the appellant I'm Brent Caldwell representing Wendell Keith Hall, the appellant in this case who was convicted in Eastern District of Kentucky District Court under 18 U.S.C. 666, a federal bribery case. We're here on the issue today of whether or not Mr. Hall received a fair trial in this case. Now I'll be candid with the court and tell you that I understand the law as it relates to the standards for mistrial. We have argued in two particular issues here, serious issues we believe that a mistrial should have been granted. One involved the statement of the wife of the defendant. They were undergoing a very difficult divorce at the time of this particular trial. And the other one issue, and I will start with the wife, but the other comments on the defendant's right to remain silent. Now, I understand under a mistrial standard it's abuse of discretion. I understand it's a very difficult high standard. But where there is substantial legal error that has occurred, or where the defendant's constitutional rights are violated, or there's clear reversible error, then you meet that standard. And we filed, for example, to go right to the heart of the issue as it relates to the wife's comments, we filed pre-trial a motion regarding the marital privilege in this case. Because we knew all along that the government had been talking to the wife and we were not sure exactly what she was going to say. So we wanted to have an issue, a hearing to determine what's privilege, what's not privilege as it relates to her testimony. We did that. District Judge, after a hearing, entered her order granting, sustaining our motion that various comments should not come into the trial. And one of those comments, two of them really, but one in particular dealt with a comment regarding the question to the prosecutor related to what did the meaning of consulting on a check mean. In this case, my client never denied that he had paid a mine inspector sums of money. Some of the checks had nothing on the memo on the line, and one in particular had on the memo on the line, consulting. So the question was, what is consulting? But you don't consider that an improper question, do you? You're asking me if I do consider that an improper question? Why would that be an improper question? I don't think that is. And Judge Caldwell... So it's an unsolicited comment. Right. Judge Caldwell, in her opinion on my motion for new trial, said it was a permissible question, and I don't disagree with that. But the question becomes, was it solicited by the prosecution, or was it just an utterance out of the blue that could be cured by admonition? Not an improper question. How can it be an improper solicitation? Well, at the hearing, and I've got the transcript of the other hearing, and it's in your record of the hearing we had on our motion regarding the spousal privilege, the prosecutor went through these questions. And in there, he says, didn't you meet with the agents and didn't you have knowledge of some other kind of undercover kind of stuff regarding under the table actions? The prosecutor knew that he had read the FBI reports of the interviews, that she had said there were other activities involved that involved under the cover kickbacks. So when he asked this question at trial, he already knew. He knew what the proposed answer, what he hoped would be the answer would come out at trial. He elicited that. I'm struggling. If you've conceded that it's not an improper question, I'm struggling with you now saying it was a planned or improper solicitation. It just seems to me that the two contradict one another. I really don't think it's contradicting. She went beyond the question. He knew what he was trying to get out. He didn't ask directly. He knew what he was trying to get out, and she blurts it out at trial. The district judge tells the jury to disregard it, right? Yes, ma'am. We have many cases that say that we believe the jury has the ability to understand. My argument on that point, if you look at the Moore case, the admonition given in this case was very simple, and I could read it to you. Jury disregard. Yes, and then did you or his lawyer at trial object to and ask for a further clarification and further instruction? No, because you don't want to draw attention to it. I know. Candidly, I did not. You're in a kind of a catch-22 situation there, so what do you do? Do you ask for it, or do you argue that it's an improper instruction? Unfortunately, we have cases that say that you need to alert the judge that you want something more, and I do understand that it's a practical matter. You're between a rock and a hard place there. In this case, if you look at that Moore case that we cited, it's very explicit. The judge was very explicit in the instructions given. It goes beyond that. Don't listen to this. You shouldn't pay any attention. A very forceful, clear admonition to the jury, but the one given by this judge was very, very short, very, very simple, and we went on. The problem is, in relation to that statement where she blurts out, in response to the question, do you have any other things that have occurred, she says, well, there was an incident where it was undercover, under-the-table things regarding kickbacks. Frankly, the air went out of the courtroom at that point. This is the third day, I think, of the trial, and once you have a spouse on a witness stand saying there's something about unrelated, uncharged activities, under-the-table kickbacks, case over. That jury didn't listen to anything else. They said, here, you've got Spice, the spouse who worked in the office of my client, who wrote checks for the business, saying, I'm aware of other unrelated activities, uncharged activities, not a part of this case, involving kickbacks. So what's the jury going to think? Now, the government's going to argue, and I think the court ruled in her motion, in the mistrial motion, oh, there's overwhelming evidence. There's overwhelming evidence. But we're talking about a fair trial here. What is fair to the defendant? And when a case is over, and it was over in this case, and as you probably read, the verdict in this case, after a long five-day trial, involving over hundreds of documents, 100 to 200 documents, jury was only out about an hour. It was very quick. There was so much bribery going on in the mind of the defense there. Well, they obviously believed that. We seriously objected to that and put on our description, our defense to that. But wasn't there substantial other evidence in the form of the gentleman who was receiving the case? The gentleman, Mr. Shortridge, did testify. There's no question he testified, and he testified concerning what he believed these payments were for. There was no direct testimony about any quid pro quo, and under 666, you don't have to prove a direct quid pro quo. But he was saying, I think I got these payments because I was expected to do something for this man in the future. And the allegation was that he would lay off of him on the strip mine citation violations. So there was testimony about that, and we went to great lengths to try to attack that. So there's no question there was evidence. We never disputed payments from him. For example, on this whole issue about, and this is kind of secondary, this issue about whether a settlement agreement document should have been admitted into evidence to show that he didn't have a motive because these fines were going to be paid by another mining company. That was not admitted. It was admitted that there was a document in the beginning that showed there was agreement with this mining operator to indemnify him. Later on, in 2014, there was a settlement agreement with the state of Kentucky that showed that, confirmed that. But the settlement agreement was 2014, and the payments were made in 2009 and 2010. Why would that be worthy of overturning a trial? That is, you know, I understand it in terms of evidence issues, that that may not be. You got, there's an agreement in, which was the key to you, and the fact that it was actually paid five years after these, how could that make a suggestion? Right, what I was trying to show, that there was confirmation that at the time these payments were made, whether it be a car loan payment or other payments, that at the time there was no motive, ultimately culminating in showing later that there was an agreement by this other mining company to pay all these fines. They assumed all these fines. My client didn't mine. He just held the permit. He had the property. He contracted out to a mining company to do this, and they agreed that if we violate the mining laws, we're going to, even if you get cited, we're going to pay for it. He was in politics, right? Yes, sir, he was. And what office did he hold? He was a state representative from Pike County, Kentucky, and he served in a variety of committees. In fact, he was on, as the record will show in the testimony, he was on the, I forget the exact name, but he was on the Natural Resources Committee because of his experience in the coal business. So he was familiar with mining and coal. He was making a little profit from it, wasn't he? From coal? From his position, his elected position. Well, I understand. I respectfully disagree with that, but I understand where you're coming from on that. Let me step back to the wife's testimony. Do you remember the introduction of the wife? My memory is that there was an indication that she was a hostile witness or that she, I don't know whether you ever talked about divorce, but wasn't the jury told that she was a hostile witness? Yes, that's in the record. Doesn't that make a difference? There's no question that, one, they were married at the time of this trial, and number two, they were in the middle of a divorce, and number three, that it was a bitter divorce going on, a hostile. That was presented to the jury? Yes, that's in the record. So they're taking the, I mean, they know where this comment's coming from, shall we say. They know where the comment's coming from. And, you know, frankly, when she blurted this out, you know, I could go no further. You know, the judge Well, there was an avenue. Once you made your objection and you didn't think that his response to the jury was adequate, you could have asked to approach the bench. No, I did. At that point? No. You then did object to the instruction? No, I objected to the testimony at trial. You know, I'm asking you, did you object to the instruction to the jury? No. No. No. But you could have asked to approach, and you could have had a conference with the court out of the hearing, and then if he wanted, or she wanted, I've forgotten, the judge, wanted to elaborate further based on your objection, your statements would not have been made to the jury, only an additional instruction would have. So there was an avenue. No, I don't disagree with that, and I think we talked about that a minute ago. When she made that admonition to the jury, I did not make another objection at that point. I made the, you know, the calculated strategic decision. I wasn't going to emphasize this point anymore. I thought it was a very weak and probably improper instruction, and I wasn't going to reemphasize it. Now, that's my trial strategy decision, right or wrong, that's what it was. And I agree with you, I could have asked to be stronger and done again, and she may or may not have done that. I understand that. Remind me, what was the sentence in this case? Excuse me, 84 months, 7 years. Serving that now? Yes, sir. Yes, sir. And a $25,000 fine, I believe it was, in this. Now, I know my time is probably running short, but I want to talk a little bit about the issue concerning, which I think is another issue, whether you agree with the first big issue about her statement, but the issue about commenting on silence. The constitutional right to remain silent. He is the one, and it's in the record, he is the one that made the complaint to the Department of Natural Resources that he was being shaken down by this mine inspector. And they took that seriously, and they decided to investigate him. And in the process, the Inspector General for the Department of Natural Resources wants to interview a variety of people. He sends my client either an email or text message, and we have that, and it's in the My client emails back, and we have that here, and it's in the record, that he respectfully declines to talk at that point in time. And so he did not talk. He refused to go in and talk any further. He made the original complaint and then did not talk. We believe that that is a clear and unequivocal indication of his right to remain silent. I think the case law is clear, even in pre-arrest, whether it be civil or criminal procedures, where there's an investigation like this going on, an individual has the right to not talk. It is true, but there's a series of cases. One is Salinas v. Texas from the Supreme Court, and the other is Abbey v. Howe from our court. And why can you say that this is an express invocation of his right to remain silent? Why do I say it? Well, what's your best case that says that his words or what he did or said is an express invocation of his right to remain silent, as opposed to just being silent? Being silent. I believe the case law says being silent, you have to take some affirmative action. Yes. And what I'm saying, I was looking as you spoke for the text. He actually takes affirmative action. He sits down and types down an email or a text message that says, I respectfully decline to be interviewed. Thank you very much for inquiring. He's just saying, I decline to be interviewed. And if you want to be extreme in your interpretation of Salinas and Abbey, you would say he has to say, I expressly invoke my right to remain silent. I don't say that. I know, who says that? And I don't think the case law requires any magical formulation of words. I'm giving you a chance to object to what your opponent is going to argue, that there was no express invocation of his right to remain silent. I don't know how much more clear you can be when you say, I don't want to be interviewed, or I decline to be interviewed. Don't bother me. Go talk to somebody else. I mean, that's a very express statement. It's no different than. It's an express statement. But is it an express invocation of the right to remain silent? I think it sure is. When you're in the midst of an investigation, you know there's an OIG investigation, which could lead to various sorts of sanctions. Sure it is. What's the difference in that? Did you say that the whole investigation began with his? With his complaint. He complained he's being shaken down by this mine inspector. And so they begin the investigation. And then in the midst of that, they call him or they send him this message saying, would you come in and be interviewed? And he declines to be interviewed. Now, I frankly don't see a lot of difference in that. And if I'm stopped on the street or picked up on a warrant for some criminal charge, and the guy says, you've been charged with assault first degree, why don't you tell me about it? And I say, no, thank you. I respectfully decline. And then I later testify at trial. A little strange in the context of Miranda that the entire investigation and the reason for asking him as well as others is his own invocation that he would like to have an investigation. It's a little strange context there for Miranda. Well, I understand that. And in the trial, the prosecutor called the inspector general himself who did the investigation to testify. And he tried to get the inspector general to speculate as to why he didn't testify. And the inspector general, being a lawyer, said, I'm not going to answer that. I don't know. I can't read his mind. I'm not going to do that. And so he didn't. So this issue came up in the rebuttal closing argument of the prosecution. I don't know what I said in closing that struck a nerve, but I must have said something, because he came back in closing and basically jammed this thing down our throat. And he asked that question. And if you read those statements in that closing argument, he doesn't just ask the question, what was his intent, why did he refuse to cooperate with the investigation and talk? We had that argument at the bench with the judge, and she let him go ahead and say that. And she said to Mr. Taylor, I'm not sure you want to go down this rabbit hole. That's in the text. I don't think you want to go down this. But he said, well, I do. I want to ask that question again. He asked that question again. And then he proceeded to the jury in rebuttal closing comment on what that meant. It was his theory, his belief, his opinion on what his refusal meant, which was basically the damaging statements about commenting on his right to remain silent. And basically he said he didn't want to answer any questions. He didn't want to be investigated. He didn't want to talk about checks to this inspector. He lays all that out, and I think that's a violation of his right to remain silent. Thank you. Thank you. Good morning. May it please the court. John Grant for the United States. Turning to the first issue about the statement, the kickback statement. As this court is aware, for this court to find that the district court abused its discretion, we had to look at five factors. And we've already talked about several of them. Was the remark unsolicited? I think everyone agrees that it was. Was the question reasonable? Yes. It was a relevant question. It could have led to relevant information. She blurted out something about a kickback. We don't really even know what she meant because that was the end of the inquiry. It was never remarked on again at the trial. Was there a limited instruction? Yes. Did the government act in bad faith? There's nothing in the record that shows that. Was it only a small part of the evidence? Yes, it was. And Judge Moore, as you pointed out, the man that was receiving the kickbacks testified and explained that he received the total amount of money he received was $47,000 in bribes. And because of that, he laid off, he relaxed his inspections and didn't cite the mines for lots of violations. And other people that worked for the state, other inspectors also testified that they saw there were violations when they came in and wondered why those had not been cited. So his testimony was backed up in that regard. So the district court then did not abuse its discretion in saying that one comment did not entitle the defendant to a mistrial. Now, the closing argument... You would have to concede it was a pretty inflammatory statement. Yes, it was. We do not dispute that it was an improper statement when she said something about a kickback. It's really not clear what she was talking about. But if you look at the whole trial, and as Judge Moore, I think you were pointing out, that it's pretty clear that she was adverse. They'd been separated for three years. What was said to show that they were adverse? Was it said that they were engaged in a divorce? Yes. She testified they'd actually been separated for three years. And actually, her testimony didn't really add that much to the case because she had signed that huge check of $25,000. They went to the, quote, consulting firm that the mine inspector's wife owned, which was just a ruse to try to put the bribes in and make them look legitimate. So she said, since she was the secretary and wrote the check, that when they coded that in the book, she looked back and saw that it was coded as consulting. But she said she didn't know of any activity that that company had done for her husband's mine companies that was consulting. That's basically what she said. And so then he further asked and said, well, he said, have you known Mr. Hall to use the notation consulting before? And she said, yes. In situations where there was no consulting, yes. What would that consulting typically be if he used that term? A lot of, I remember an incident where it was under consulting, but it was more like an under the table kickback. So that's basically what the testimony was. And there was no other, clearly we admit that was an improper answer. But I think the way that Judge Caldwell handled the situation was appropriate. And I think Judge Strand, as you're talking about, he had every opportunity to say, Judge, it's not adequate. This is so inflammatory that I think we need to take a more limited here and give a more forceful instruction. It just wasn't done. So I don't think, you know, of course no one's in trial to a perfect trial. This wasn't a perfect trial. None of them are. It was a clearly improper comment. We agree with that. But it certainly does not justify a new trial. Give us the background for why the investigation began. I thought there was some other independent investigation or question that resulted in this investigation as opposed to it being solely on the basis of the defendant's complaint. That, he was, this mine inspector was on the radar because of these other inspectors going in and seeing that these violations were not being cited. So he was, the inference from all the testimony would be that he looked like he was a bad employee, he was a bad mine inspector. But basically the defendant got himself in trouble when he actually made the allegation there was extortion going on. Because what had happened is after the payments had been made, the mine inspector wanted more money. So he was approaching the defendant and saying, trying to get more money out of him. And so therefore all this friction had developed between the defendant and the mine inspector. And then this, Mr. Hall was in the state house of representatives at the time. He then made a complaint about that this mine inspector was trying to extort money from him. But then by the time that the investigation actually started and the office inspector, general inspector sent an email which is on appendix page 14. He said, my name is Alan Wagers and I work for the IG's office. Keith Thacker gave me your cell. We are investigating a state employee. We'd like to interview you relative to the statements he allegedly made to Mr. Thacker and you. Please call me on my cell so we can set up an interview. And that was in response to him making the complaint, the defendant, Mr. Hall. And then I think it's interesting to look exactly what the text says. It says, respectfully, this is the response, Mr. Hall. This is appendix page 15. Respectively, Mr. Wager, no comments were made directly to me. I am in the coal business and do not want to be interviewed and politely decline your offer. Mr. Thacker, my partner with Trey K Mining and Electric, gave you all the info you need. I have no further comments. Thank you for the invitation, Representative W. Keith Hall. So I'm not sure, Judge Moore, you were talking about the parameters of the invocation, the right to remain silent. Certainly there's some statements that would clearly be the right and some that aren't. I'm not sure where you draw the line. But I would suggest that this clearly isn't even approaching the line because he did make statements. He said, I don't have any further comments versus what my business partner told you. He told you all the information. I don't have any other comments to make. And it was quite strange because he was the one that initiated the investigation. But I don't really think the court even has to get into all the legalities of whether the right to silence was invoked because when the government moved to introduce these emails, the defendant said there was no objection. And he even asked the state inspector about these emails. And the defendant himself testified about that. So once it was properly admitted, the government then can forcefully argue any inferences from the evidence in his closing argument. So therefore, I can't see that there could possibly be an error relating to the closing argument. Your argument is that there was not even a violation of the right to remain silent because there was authorization by the failure to object to the introduction of the emails. Well, not only did they not object, they said they had no objection when the judge asked them, do they object to the evidence? They said there was no objection. So if there was some kind of right to remain silent, then it's just the email. And so the email was put into evidence. So why can't the prosecutor then forcefully comment on any inferences that the email would? And of course, it was very damaging to him since the argument is that he didn't rely on his right to remain silent because he didn't remain silent. Exactly, Judge Merritt. That's exactly the point. I'll be happy to answer any other questions. If not, we would request that the case be affirmed. Thank you. Just a couple of points to reiterate. Mr. Grant has read to you the email text message. I think it's very clear he's declining. He says it two or three times in there, I'm not going to be interviewed. Yes, he made the complaint initially. Then he decides not to talk. I think that's a clear indication. Does he decide not to talk or does he say all the information I have, you have been given? He says, and I think you're almost verbatim quoting that, Judge, he says, no comments were made respectfully to me. I am in the coal business, do not want to be interviewed and politely decline your offer. Mr. Thacker, my partner with Trey K. Mining and Electric, gave you all the info you need. I have no further comments. The only comments he ever made is when he made the original complaint saying I'm being shaken down by the mine inspector and he told him I didn't have any contact with this guy. I said, no, there ain't any contact with this guy as it relates to the shakedown and you're going to have to talk to Mr. Thacker. He's got all the information because that's where the conversation took place and I decline to be interviewed any further. Now, in response to that, the prosecutor in his rebuttal closing argument, when he's allowed, after I object when they're getting into this, the judge allows him, after warning him, you may not want to go down this rabbit hole, and I think he opened a sinkhole, and he said, I only want to ask one question, and he says, I can't ask. This is when he's asking a question from the transcript. Ladies and gentlemen, why was it Mr. Hall didn't want to submit himself to pointed questions from the OIG? Okay? Now, he said he wanted to ask that question, the judge said he could ask it, and then what did he do? He went on and commented. I submit to you that the reason was because he didn't want to go into the details and answer the question, do you have any business? Have you had any business with Kelly Shortridge? Have you ever paid him anything? What's this underlying dispute that you have? Why does he say he owes you this? Can we see your bank records? He didn't want to go there. He used that statement and my client's silence as substantive evidence of guilt to convict him on these other, on the 666 charge. His right to remain silent and not answer any of those questions was used based on that comment to convict him. It really was. I think that's a violation of his right. Your red light is on again. I'm sorry. I wasn't looking down, Your Honor. Thank you both for your arguments. Thank you all. The case will be submitted with the clerk call the next case.